Gerald M. WERNER

v.

The UNITED STATES.

No. 5–79.

United States Court of Claims.

Feb. 25, 1981.

Thomas G. Armstrong, Lake Elmo, Minn., attorney of record, for plaintiff.

Donald J. Boday, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant.

Quentin Richardson, JAGC, Dept. of the Army, Denver, Colo., of counsel.

Before NICHOLS, KASHIWA, and SMITH, Judges.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

SMITH, Judge:

This military pay case is before the court on the parties' cross-motions for summary judgment. The motions, on which we have heard oral argument, require us to review a decision of the Army Board for Correction of Military Records (ABCMR) denying plaintiff's application for correction of his military records.[1] The requested correction was that plaintiff's records be changed to reflect that his unauthorized absence from duty from March 17, 1964, to December 3, 1971, was excused as "unavoidable."

Plaintiff alleges that the ABCMR decision denying the requested correction of his records is arbitrary and capricious and is not supported by substantial evidence. Additionally, he alleges that the decision is founded on an erroneous interpretation of 37 U.S.C. § 503(a) (1976) and Army regulations pertaining to this subsection. Finally, plaintiff argues that the ABCMR decision is violative of his due process and equal protection rights under the fifth amendment.

We do not reach plaintiff's constitutional arguments because we have decided that he is entitled to relief on other of the grounds which he has asserted. Specifically, we find that (i) the decision of the ABCMR is inadequate because there is no satisfactory indication that the ABCMR based its decision on a balanced consideration of all the evidence presented and available to it, (ii) even assuming that the ABCMR considered all the evidence in reaching its decision, there does not exist substantial evidence to support the decision, (iii) the ABCMR decision appears to be premised on an incorrect standard of what constitutes an unavoidable absence under 37 U.S.C. § 503(a) and Army regulations pertaining to this subsection, and (iv) applying to the administrative record the correct legal standard of what constitutes an unavoidable absence, plaintiff is entitled to have his March 17, 1964—December 3, 1971, absence from duty excused as unavoidable. On the basis of the foregoing findings, we hold that plaintiff is entitled to recover military pay and allowances for the period December 1, 1964—December 3, 1971, and to have his military records corrected to reflect that his March 17, 1964 —December 3, 1971, absence was excused as unavoidable.

I.

A. Plaintiff enlisted in the United States Army on December 15, 1959. He was commissioned a second lieutenant in the Army on August 8, 1961. He remained on active duty as an Army officer until December 5, 1971.

In March 1964, plaintiff held the rank of first lieutenant and was stationed in the Federal Republic of Germany. He was assigned to the First Reconnaissance Squadron, Second Armored Cavalry Regiment, United States Army, Bayreuth, Federal Republic of Germany. On March 13, 1964, plaintiff killed Ursula Schamel, a female German national, by choking and drowning her in a bathtub. On March 17, 1964, he was arrested by United States military authorities and was placed in pretrial confinement at the United States Army stockade in Fuerth, West Germany. On March 25, 1964, pursuant to the provisions of the NATO Status of Forces Agreement (SOFA), the German public prosecutor elected to prosecute plaintiff under German law in the German courts. Plaintiff continued to be held, however, at the U.S. Army stockade in Fuerth.

On November 14, 1964, in the criminal court of Bayreuth, West Germany, plaintiff

---

1. The application was executed by plaintiff's father, who was acting in his capacity as guardian of plaintiff's person and estate.

was indicted for first degree murder of Ursula Schamel. All of his military pay and allowances were terminated as of November 30, 1964. On October 18, 1966, the Bayreuth criminal court found plaintiff not guilty of any offense by reason of his "total mental irresponsibility,"[2] and it ordered him committed to a German mental institution for care. On April 11, 1967, plaintiff's acquittal and the order committing him to a German mental institution were affirmed by the Federal Supreme Court of West Germany. On April 26, 1967, plaintiff was transferred from the U.S. Army stockade in Fuerth to a German mental institution.

On November 21, 1967, Lt. Gen. Frank T. Mildren, who was plaintiff's corps commander, determined that plaintiff's "absence from duty from the outset and to this date" was not unavoidable and, therefore, was not excused. Plaintiff remained in confinement in a German mental institution until December 2, 1971. On that date, he was released from such confinement and was returned to the control of U.S. military authorities. On December 3, 1971, he was granted a permanent disability retirement from the Army and was placed on the retired list effective December 6, 1971, with a 100-percent disability.[3]

On December 8, 1971, having been transported to his home state of Minnesota, plaintiff was declared incompetent and mentally ill by a Minnesota state court, and was committed for psychiatric care to two hospitals. On September 26, 1972, Reinhold O. Werner, plaintiff's father and guardian of plaintiff's person and estate, submitted to the ABCMR an application for correction of plaintiff's military records.[4] The re-quested correction was that plaintiff's records be changed to reflect (i) that his March 17, 1964–December 3, 1971, absence from duty was excused as unavoidable and (ii) that he was in a full pay status for the period November 30, 1964–December 3, 1971. The application stated that this correction was being requested "by reason of Supreme Court of the Federal Republic of Germany ruling of insanity and [plaintiff's being] committed to a mental institution." On April 16, 1975, without having granted a hearing, the ABCMR denied the application because "insufficient evidence [had] been presented to indicate probable material error or injustice." The ABCMR did not specify the legal or factual grounds for its just quoted conclusion, although it appears that the ABCMR was guided by a case memorandum written by an ABCMR examiner.

On January 6, 1976, a Minnesota state court adjudged plaintiff to be of sound mind and capable of taking care of himself and his property. As of the same date, it restored him to capacity and terminated his guardianship. On January 4, 1979, plaintiff petitioned this court for military pay and allowances for the period December 1, 1964–December 3, 1971, plus simple interest on such amount at 6 percent per annum.[5]

B. The administrative record is replete with medical reports diagnosing plaintiff's mental condition as of the time he killed Ursula Schamel and documenting his medical history to the time of his December 6, 1971, retirement from the Army. All of these medical reports are in substantial agreement. They establish conclusively

---

2. The applicable German criminal statute was translated as follows:

   "51.1. Irresponsibility.

   "1. No act constitutes an offense if its perpetrator at the time of its commission was incapable of appreciating the unlawfulness of his deed or of acting in accordance with such appreciation, by reason of derangement of the senses, morbid disturbance of mental activity or mental deficiency."

3. The Army restored plaintiff to pay status for the final 2 days of his active duty, i. e., for December 4 and 5, 1971.

4. Hereafter in the text, we refer to this application as "the application" or "plaintiff's application for correction of his military records."

5. We are unable to award plaintiff interest on any amount of military pay and allowances to which he is entitled because the United States has not waived its sovereign immunity with respect to such an award. See 28 U.S.C. § 2516(a) (1976) and *United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 518 F.2d 1309 (1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976).

that plaintiff was insane when he killed Schamel, that his insanity was not caused by any misconduct on his part but was caused incident to his military service, and that he remained insane to the time of his retirement. We delineate below some of these reports.

On December 1, 1964, an Army medical board found plaintiff to be insane and his condition to be caused in line of duty. On December 1, 1966, an Army medical board determined that plaintiff was suffering from "[s]chizophrenic reaction, paranoid type, chronic, severe; manifested by depersonalization, disturbance of affect, delusions of persecution, autistic thinking, looseness of associations, and auditory hallucinations." The same board determined that (i) the approximate date of origin of this condition was March 1964, (ii) the condition was caused incident to service, (iii) the condition did not exist prior to plaintiff's entry on active duty, (iv) the condition was aggravated by active duty, and (v) the condition occurred in line of duty.

On September 9, 1970, an Army physical evaluation board determined that plaintiff's condition was "[p]aranoid [s]chizophrenic, chronic" and that this condition was permanent. Additionally, the physical evaluation board determined that (i) plaintiff incurred or aggravated the condition while he was entitled to basic pay, (ii) the condition was not the result of intentional misconduct or willful neglect, and (iii) the condition was not incurred during a period of unauthorized absence. The board rated plaintiff's disability as 100 percent.

C. (1) In announcing his November 21, 1967, determination that plaintiff's absence from duty was not unavoidable, Lt. Gen. Frank T. Mildren did not specify the factual or legal grounds on which he based this determination. Mildren announced the determination by making the following communication to "Commander in Chief, United States Army, Europe & Seventh Army, ATTN: AEAJA–MA, APO 90403":

I have reviewed the facts and circumstances surrounding the pay status of First Lieutenant Gerald M. Werner, 05 405 809, in accordance with paragraph 12124, AR 37–104 and determined that his absence from duty from the outset and to this date was not unavoidable and therefore, the absence from duty is not excused.

There is evidence in the administrative record tending to indicate that (i) Mildren concluded that plaintiff's absence from duty was not unavoidable *before* he had access to plaintiff's personnel file, which presumably contained some of the medical reports discussed in section I.B. of this opinion, *supra*, and (ii) prior to Mildren's unavoidability determination, Mildren's immediate military superiors expressed their opposition to plaintiff's absence being excused as unavoidable. Also, evidence in the administrative record establishes that, prior to Mildren's unavoidability determination, numerous articles urging that plaintiff not be accorded pay for the period of his absence appeared in German and American newspapers.

(2) Prior to ruling on plaintiff's application for correction of his military records, the ABCMR requested Colonel Nelms of the U.S. Army Enlisted Records Center to furnish it "with an opinion for [its] guidance * * *, as to whether the time Lt. Werner was absent from duty, during the period 17 Mar 64 to 3 Dec 71, would have been excused as unavoidable, had he requested such action under the provisions of AR 630–10, prior to his retirement." On October 26, 1973, Colonel Nelms responded to this request by communicating the following to the ABCMR:

1. It has been administratively determined that the absence of Gerald M. Werner, 472 36 9685 from 17 March 1964 to 3 December 1971 is excused as having been unavoidable, due to his mental instability. The severe mental illness which manifested itself in March 1964 continued to determine his behavior and his management, as a chronically psychotic individual, during the period in question. Accordingly, this period will not be considered as time lost under Title 10, United States Code, Section 972.

2. A period of unauthorized absence which is excused as unavoidable will be credited for all purposes.

Notwithstanding this communication by Colonel Nelms, the ABCMR, on April 16, 1975, denied without granting a hearing and without issuing an opinion, plaintiff's application for correction of his military records. In reaching its decision to deny the application, the ABCMR appears to have been guided by a case memorandum written by Watts P. Tyler, an ABCMR examiner. In this case memorandum, Tyler concluded, after recounting some of the circumstances of plaintiff's absence from duty,[6] that "insufficient justification exists for changing [plaintiff's] records to show entitlement to military pay and allowances * * * from 30 Nov 64 to 3 Dec 71." Tyler appears to have derived his conclusion primarily from two sources: his mistaken belief that plaintiff "performed no military duties during the period [of plaintiff's March 17, 1964–December 3, 1971, absence from duty]"[7] and the statement in Comp. Gen. No. B–131446 (1957) that "Congress, by enactment of the Armed Forces Leave Act [which, as amended, is codified in pertinent part as 37 U.S.C. § 503(a) (1976)], did not intend to create or sanction a rule which could result in payment of pay and allowances for a term of years without any service or other real consideration to the Government therefor."

## II.

■ Our review of the ABCMR decision denying plaintiff's application for correction of his military records has been hampered by several factors. First, the ABCMR did not specify the factual or legal grounds for its decision. It merely stated, in perfunctory fashion, that "insufficient evidence [had] been presented to indicate probable material error or injustice." Second, even assuming—as is likely—that the ABCMR decision was predicated on the case memorandum written by ABCMR examiner Watts P. Tyler, "there is no satisfactory showing on the record that the [decision] was based upon a balanced consideration of all the evidence available and presented."[8] Tyler's case memorandum did not mention the crucial medical findings that plaintiff's insanity was caused incident to service, that it was not the result of intentional misconduct or willful neglect, and that it was not incurred during a period of unauthorized absence.

Because of the foregoing factors,

we cannot give as much deference to the Board's determination as if it had given detailed findings to support, and fuller explanations of the reason for, its conclusion. We are compelled to look to the record without much help from the Board's [decision], and therefore, without the need to accord as great weight to its determination as we otherwise would. [Citation omitted.][9]

A. At oral argument, defendant's counsel asserted—not seriously, we believe—that a member of the military is entitled to the pay and allowances attendant to his military grade and status only if he has rendered military services in exchange for these emoluments. Defendant's counsel argued, in short, that entitlement to military pay is a *contractual* right.

---

6. In his recountal of the circumstances of plaintiff's absence from duty, Tyler did not mention several of the medical findings detailed in section I.B of this opinion, *supra*. For example, he did not mention the findings that plaintiff's insanity was caused incident to service, that it was not the result of intentional misconduct or willful neglect, and that it was not incurred during a period of unauthorized absence.

7. From March 17, 1964, through April 26, 1967, plaintiff was "gainfully employed in the supply section" of the U.S. Army North Bavaria District Confinement Facility.

8. *Beckham v. United States*, 183 Ct.Cl. 628, 392 F.2d 619 (1968). *See also Smith v. United States*, 168 Ct.Cl. 545, 552–53 (1964).

9. *Loral Elects. Corp. v. United States*, 181 Ct.Cl. 822, 832, 387 F.2d 975, 980 (1967), cited in *Beckham v. United States, supra* note 8, 183 Ct.Cl. at 636, 392 F.2d at 623.

Defendant appears to have made a similar argument in *Bell*.[10] Rejecting any argument of this kind, the Supreme Court observed there:[11]

> * * * [C]ommon-law rules governing private contracts have no place in the area of military pay. A soldier's entitlement to pay is dependent upon statutory right. * * * [Footnotes omitted.]

This basic principle has always been recognized. It has been reflected throughout our history in numerous court decisions and in the opinions of Attorneys General and Judge Advocates General. "Enlistment is a contract; but it is one of those contracts which changes the status; and, where that is changed, no breach of the contract destroys the new status or relieves from the obligations which its existence imposes.... By enlistment the citizen becomes a soldier. His relations to the State and the public are changed. He acquires a new status, with correlative rights and duties; and although he may violate his contract obligations, his status as a soldier is unchanged." *In re Grimley*, 137 U.S. 147, 151, 152, 11 S.Ct. 54, 54, 55, 34 L.Ed. 636. The *Bell* Supreme Court continued its exposition of this principle by noting:[12]

> Almost a hundred years ago Attorney General Hoar rendered an opinion to the Secretary of War regarding the right to pay of a Major Herod, who had been "charged with murder, arrested, tried by a court-martial, and sentenced to be hung." The Attorney General stated:
>
> > "It was not expressly a part of the sentence that Herod should forfeit his pay from the date of his arrest, and I know of no statute imposing a forfeiture of pay from the date of arrest in a case like this of Herod's. The sentence that he be hung necessarily implied a dismissal from the service, but not, as it seems to me, the forfeiture of back pay. I can find no authority for the opinion of the Comptroller that, as

Herod was withdrawn from actual military service by his arrest made on account of a crime committed by him, on the general principle that pay follows services, he should not be paid for the time he was under arrest. The monthly pay of officers of the Army is prescribed by statute, and so long as a person is an officer of the Army he is entitled to receive the pay belonging to the office, unless he has forfeited it in accordance with the provisions of law, whether he has actually performed military service or not." 13 Op.Atty.Gen. 103, 104.

> A similar opinion was rendered by Attorney General Alphonso Taft a few years later. He rejected the theory of the Second Comptroller of the Treasury that "[i]f the man, by his misconduct and necessary withdrawal from service, does not perform his part of the contract, the Government cannot be held to the fulfillment of its part thereof." The Attorney General said:
>
> > "The Comptroller has, I think, misconceived the true basis of the right to [military] pay .... In the naval, as in the military service, the right to compensation does not depend upon, nor is it controlled by, 'general principles of law'; it rests upon, and is governed by, certain statutory provisions or regulations made in pursuance thereof, which specially apply to such service. These fix the pay to which officers and men belonging to the Navy are entitled; and the rule to be deduced therefrom is that both officers and men become entitled to the pay thus fixed so long as they remain in the Navy, whether they *actually* perform service or not, unless their right thereto is forfeited or lost in some one of the modes prescribed in the provisions or regulations adverted to." 15 Op.Atty.Gen. 175, 176.

Thus, entitlement to military pay is created and governed entirely by statute.

**10.** *Bell v. United States*, 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961).

**11.** *Id.* at 401–02, 81 S.Ct. at 1234–1235.

**12.** *Id.* at 402–04, 81 S.Ct. at 1235–1236.

The governing statute in the instant case is 37 U.S.C. § 503(a) (1976). It provides in pertinent part: "A member of the Army, * * * who is absent without leave or over leave, forfeits all pay and allowances for the period of that absence, *unless it is excused as unavoidable.*" (Emphasis supplied.) In paragraph 2.*m* of Army Regulation (AR) 630-10, dated May 24, 1966, an "unavoidable" absence was defined as "[a]n unauthorized absence which occurred through no fault of the member or the Government, such as when the member was insane or in confinement under charges which were dismissed or of which he was acquitted." In construing "unavoidable" in *Borys,* this court held that an "absence due to a member's misconduct is not unavoidable." [13] In reaching this holding, the court was guided by the decision of the Comptroller General reported at 39 Comp.Gen. 781. In that decision, it is stated: [14]

> situations may arise where a [military] member's [unauthorized] absence is caused by events beyond his control. In such a case and if an administrative finding is made that the absence in fact resulted from events beyond the member's control and not due to his misconduct, there would appear to be sufficient reason for his commanding officer to excuse the absence as unavoidable, * * *. * * *

The fundamental issue in the instant case is, then, whether plaintiff's March 17, 1964– December 3, 1971, absence from duty was beyond his control and not due to misconduct on his part. If this absence was beyond his control and not due to misconduct on his part, the Army was required under 37 U.S.C. § 503(a) to excuse it. Failure to excuse the absence under such circumstances would constitute an abuse of discretion. [15]

B. Plaintiff's absence from duty was precipitated by his killing Ursula Schamel. The West German courts *acquitted* him, after trial and by reason of his "total mental irresponsibility," of any crime in connection with this killing. Army Regulation 37-104, dated February 1965, provided at paragraph 12124: "*Absence Excused as Unavoidable.* Any of the following circumstances is sufficient basis for excusing an absence as unavoidable: *a.* Member [who is charged with a civil offense and confined by civil authorities] is tried and acquitted." [16]

Defendant points out that plaintiff's acquittal did not *require* the Army to excuse his absence as unavoidable. In *Borys,* we held that paragraph 12124*a* of AR 37-104 "is permissive only and not mandatory." [17] We held further in *Borys* that, even though the plaintiff there had been acquitted by civil authorities of two of the charges lodged against him, had not been tried by civil authorities on any remaining charge, and had obtained a setting aside of his court-martial conviction, [18] the Army was

---

• **13.** *Borys v. United States,* 201 Ct.Cl. 597, 607, cert. denied, 414 U.S. 1001, 94 S.Ct. 355, 38 L.Ed.2d 237 (1973).

**14.** 39 Comp.Gen. at 783.

**15.** The Army's discretion to determine whether an absence is unavoidable is not unfettered. The exercise of this discretion must comport with the intendment of section 503(a) that unavoidable absences are to be excused.

**16.** The same Army regulation provided additionally:

"12122. Confined Because of Civil Offense. *a. Confined by Civil Authorities.* A member who is charged with a civil offense and confined by civil authorities is in unauthorized absence (except for the part of the period covered by authorized leave). He is entitled to pay and allowances for the period of confinement only if his commander excuses the absence as

unavoidable after results of the trial are known. * * *

\* \* \* \* \* \*

"*c. Confined by Military Authorities for Foreign Civil Offense.* A member on foreign duty who is confined by military authorities for an offense over which a foreign country has the primary right to exercise jurisdiction is entitled to otherwise proper credit of pay and allowances until the date foreign jurisdiction is exercised by indictment or other proper process. Thereafter, entitlement May exist only for a period covered by authorized leave. Rules stated in *a* above apply. \* \* \* "

**17.** *Borys v. United States, supra* note 13, 201 Ct.Cl. at 606.

**18.** The plaintiff's court-martial conviction was set aside because it was determined that the military did not have jurisdiction "over civilian crimes." *Borys v. United States, supra* note 13, 201 Ct.Cl. at 607.

justified in determining that his absence from duty was not "unavoidable." The court upheld this determination because there was substantial evidence to support the Army's fact-finding that the plaintiff had perpetrated the acts of misconduct which were the subject of the charges against him.

Defendant attempts to equate the situation of the instant plaintiff with the situation of the *Borys* plaintiff. More specifically, defendant would analogize the killing of Ursula Schamel to the acts of misconduct of the *Borys* plaintiff. Defendant's suggested analogy is without substance.

The plaintiff in *Borys* was sane when he engaged in the misconduct involved in that case. In other words, he understood, at the time of the misconduct, that he was engaging in misconduct and that the misconduct could eventuate in a forfeiture of his military pay and allowances. The instant plaintiff, on the other hand, was totally insane when he killed Schamel. Moreover, his insanity had not been caused by any misconduct on his part, but had occurred incident to his military service.

Notwithstanding this factual distinction between the instant plaintiff and the *Borys* plaintiff, defendant argues that the killing of Schamel constitutes, for purposes of 37 U.S.C. § 503(a), misconduct by the instant plaintiff. According to defendant, plaintiff's insanity at the time of this killing does not avoid characterization of the killing, for purposes of section 503(a), as misconduct. In short, in defendant's view, the killing is misconduct notwithstanding plaintiff's insanity at the time of the killing. As support for this view, defendant cites *Merwin* [19] and Comp.Gen. No. B-131446 (1957).

Defendant's reliance on *Merwin* is misplaced. In *Merwin*, the court interpreted "Army regulations 35–2480, paragraph 11." [20] This paragraph dealt with members

of the Army who were absent from duty because of their detention by civil authorities for trial. The paragraph *required* that, if such a member was "acquitted," he be paid military pay and allowances for the period "after date of arrest * * * to date of discharge." In other words, the paragraph granted to such member, upon his acquittal, *mandatory* retroactive restoration to military pay entitlement.

The dispositive issue in *Merwin* was whether an acquittal by reason of insanity constituted being "acquitted * * * in the sense and meaning given to the word in [paragraph 11]." [21] The court held that "acquitted" as used in this paragraph did not include an acquittal by reason of insanity. On the basis of this holding, the court concluded that the *Merwin* plaintiff, who had been tried for murder by civil authorities and had been found not guilty by reason of insanity, was not entitled to military pay and allowances for the period of his confinement by civil authorities. [22]

*Merwin* is distinguishable from the instant case. The Army regulation interpreted in *Merwin*, "Army regulations 35–2480, paragraph 11," is not involved here. The applicable regulation here is paragraph 12124a of AR 37–104. Unlike paragraph 11, this paragraph is permissive, not mandatory.

This distinction is important. A conscious act of misconduct, such as drug abuse, may lead to or cause insanity. Where a person has become *insane because of such misconduct*, his acquittal of a subsequent crime by reason of this insanity should not result in a retroactive restoration of his entitlement to military pay. [23] Under paragraph 12124a, this result can be avoided because the paragraph is permissive only. However, under paragraph 11, which was mandatory, this result could not have

**19.** *Merwin v. United States*, 78 Ct.Cl. 561 (1933).

**20.** *Id.* at 564.

**21.** *Id.* at 565.

**22.** This confinement consisted of the plaintiff's detention while awaiting trial and his post-trial commitment to a state mental institution.

**23.** In such a case the totality of the circumstances would not permit it to be said that an enforced absence was unavoidable.

been avoided had "acquitted" as used in paragraph 11 been interpreted to include acquittal by reason of insanity.

The foregoing distinction leads us to interpret "acquitted" in paragraph 12124a of AR 37–104 differently from the interpretation which "acquitted," as used in "Army regulations 35–2480, paragraph 11," received in *Merwin.* We hold that "acquitted" in paragraph 12124a *includes* acquittals by reason of insanity.

Comp.Gen. No. B–131446 (1957) is the other authority which defendant cites to support its view that plaintiff's insanity at the time he killed Schamel does not avoid characterization of this killing, for purposes of 37 U.S.C. § 503(a), as misconduct. Comp. Gen. No. B–131446 concerned an airman who was "absent without leave from 14 February 1951 until apprehended and returned to Air Force jurisdiction on 27 December 1955." It was determined by the Air Force that, throughout this period of absence, the airman was mentally incompetent.

One of the questions examined in Comp. Gen. No. B–131446 was whether the airman's absence was unavoidable within the meaning of the statutory provision now codified as 37 U.S.C. § 503(a). The Comptroller General opined that the absence was not unavoidable within the meaning of this provision. He based his opinion, in part, on his view that "Congress, by enactment of [the statutory provision now codified as 37 U.S.C. § 503(a)], did not intend to create or sanction a rule which could result in payment of pay and allowances for a term of years without any service or other real consideration to the Government therefor."

Defendant would have us concur in the just quoted view of the Comptroller General. The view appears to be the touchstone of the ABCMR's denial of plaintiff's appli-

cation for correction of his military records.[24] Not only do we decline to adopt the view, we regard it as being an erroneous construction of 37 U.S.C. § 503(a).

The view boils down to the proposition that section 503(a) does not authorize or even contemplate the excusal as unavoidable of *any* absence which lasts "for a term of years." This proposition is without foundation. There is no express statutory limitation, in section 503 or elsewhere, on the duration of absences which may be excused as unavoidable. Similarly, no Army regulation imposes such a limitation. In fact, paragraph 71a of AR 630–10[25] provided in pertinent part:

71. Authority to reclassify or excuse absence. *a.* If * * * an unauthorized absence qualifies as an unavoidable absence which may be excused, the following commanders may accomplish such actions:

\* \* \* \* \* \*

(3) An absence *exceeding* 30 days *may be* * * * *excused* * * * by the officer exercising general court-martial jurisdiction over the individual. [Emphasis supplied.]

Finally, in *Bleak*[26] this court indicated that a 7-year absence from duty could, under certain circumstances, be excused as unavoidable under section 503(a).

◼ On the basis of the foregoing considerations, we hold that, if an absence from duty is unavoidable, it may be excused under 37 U.S.C. § 503(a) regardless of what the duration of the absence is. In other words, we hold that section 503(a) does not restrict absences which may be excused as unavoidable to any specific duration. To the extent that Comp.Gen. No. B–131446 is based on the different view stated therein, we disagree with that decision.[27]

---

24. See section I.C(2) of this opinion, *supra.*

25. As modified by change No. 6, dated October 3, 1969.

26. *Bleak v. United States,* 214 Ct.Cl. 812 (1977).

27. The Comptroller General appears to be moving away from the view stated in Comp.Gen.

No. B–131446. In 40 Comp.Gen. 366 (1960), he opines:
   " * * * Whether a particular unauthorized absence was unavoidable is a *question of fact* and an enlisted man's mental competency is one fact for consideration in determining the character of his absence. If, because of mental incompetency, an enlisted man could not com-

C. Plaintiff's killing of Ursula Schamel, notwithstanding the abhorrent circumstances, was not misconduct for purposes of determining whether his March 17, 1964–December 3, 1971, absence from duty was unavoidable within the meaning of 37 U.S.C. § 503(a) and Army regulations pertaining to this subsection. The killing was not "misconduct" for at least three reasons. First, plaintiff was insane when he killed Schamel. Second, his insanity was not caused by misconduct or negligence on his part, but occurred incident to his military service. Third, his insanity was not incurred during a period of unauthorized absence.

Plaintiff's killing of Schamel led to his arrest by U.S. military authorities, his confinement in a U.S. military stockade, and his commitment to a German mental institution by order of the German courts. All these events were beyond plaintiff's control.

The net effect of the foregoing facts is that plaintiff's absence from duty was unavoidable within the meaning of section 503(a) and Army regulations pertaining thereto. Hence, Lieutenant General Mildren should have excused plaintiff's absence. Mildren's failure to do this constituted an abuse of discretion.

The failure of the ABCMR to correct this abuse is legal error. The failure appears to have stemmed from a mistaken belief by the ABCMR that no unauthorized absence "for a term of years" can be excused as unavoidable under section 503(a). Whatever was the interpretation of section 503(a) applied by the ABCMR to the facts of this case, we conclude, upon application of the correct interpretation of the section, that the decision of the ABCMR denying plaintiff's application for correction of his military records is unsupported by substantial evidence.

### CONCLUSION

Plaintiff is entitled to recover military pay and allowances for the period December 1, 1964–December 3, 1971, and to have his military records corrected to reflect that his March 17, 1964–December 3, 1971, absence from duty was excused as unavoidable. His motion for summary judgment is granted to this extent. Defendant's cross-motion for summary judgment is denied, except as to plaintiff's claim for interest on the amount of military pay and allowances to which he is entitled. This interest claim is denied. Judgment is entered for plaintiff with the amount thereof to be determined pursuant to Rule 131(c). Pursuant to our authority under 28 U.S.C. § 1491 (Supp. II 1978), we order the Secretary of the Army to make the record correction described above.

prehend that he was absent from his post of duty without authority, that fact may justify a conclusion that such absence, as far as the enlisted man is concerned, was unavoidable within the scope of the definition and statute mentioned. * * * " (Emphasis supplied.)

In its answer to plaintiff's petition, defendant raises two additional defenses: the statute of limitations and laches. It has omitted, however, to urge these defenses in its motion for summary judgment. Hence, we regard the defenses as abandoned.