Alonzo A. SWANN, Jr., Plaintiff,

v.

William GARRETT, Secretary of
the Navy, United States
Navy, Defendant.

Civ. No. H91–62.

United States District Court,
N.D. Indiana,
Hammond Division.

Dec. 16, 1992.

Ronald F. Layer, Sachs and Hess, P.C., Hammond, IN, for plaintiff.

Orest Szewciw, Asst. U.S. Atty., Hammond, IN, for defendant.

## ORDER

LOZANO, District Judge.

This matter is before the Court on the Defendant's Motion to Dismiss and Alternative Motion for Summary Judgment, filed April 23, 1991. For the reasons set forth herein, the Defendant's Motion to Dismiss is GRANTED IN PART and DENIED IN PART; the Defendant's Alternative Motion for Summary Judgment is DENIED, and the decision of the Board for Correction of Naval Records ("BCNR") is hereby REVERSED and REMANDED with instructions to award the Plaintiff a Navy Cross.

## BACKGROUND

The Plaintiff, Alonzo A. Swann ("Swann"), is a former member of the United States Navy who served on board the aircraft carrier U.S.S. INTREPID during World War II. On October 29, 1944, he was a member of the twenty-one man crew of Gun Tub # 10 when the INTREPID was attacked by Japanese aircraft. (A.R. at 326) All of the INTREPID's gunnery crews, with the exception of Gun Tub # 10, abandoned their positions as an attacking plane was headed directly at Gun Tub # 10. (A.R. at 9–10) Although the crew of Gun Tub # 10 successfully prevented the Japanese plane from crashing into the INTREPID's flight deck, the plane crashed directly into Gun Tub # 10. Of the twenty-one (21) members of Gun Tub # 10, nine were killed

and seven were wounded. (A.R. at 10) Records state that this was only the second time that a Navy carrier came under a Kamakazi attack. (A.R. at 10)

Swann, a Steward's Mate First Class, was one of the wounded crew members of Gun Tub # 10. Each of the survivors was awarded a Bronze Star for their action. Swann's service record shows an award date of February 15, 1944 and an award citation is dated February 2, 1945. Swann contends that he was one of six black men who were awarded the Navy Cross for their actions on October 29, 1944, and that he and his fellow black Steward's Mates had their Navy Crosses taken away and substituted with Bronze Stars because of their race. (See Affidavit of Swann)

On October 20, 1983, Swann made a formal application to the BCNR, asking them to amend his records to indicate that he was awarded the Navy Cross. (A.R. at 306) On January 5, 1984, the head of the Awards and Special Project Branch of the Chief of Naval Operations informed Swann that "[o]fficial Navy records do not show any evidence of the Navy Cross being awarded to you...." (A.R. at 309) Despite the BCNR's denial of the plaintiff's request for relief, Swann continued to gather information supporting his claim. Congresswoman Katie Hall became involved in Swann's quest and submitted several documents on Swann's behalf to the BCNR. Among this information gathered was a temporary Navy citation awarding Que Gant, another black member of Gun Tub # 10., the Navy Cross (A.R. at 277), and a letter from Gant to the Navy, dated June 15, 1946, asking why he had not yet received the Navy Cross which he was awarded. (A.R. at 384) Also included was a newspaper article in the New York Times stating that six members of the gun crew were awarded the Navy Cross, which was based on a press release issued by the Navy, and stated that six men were awarded the Navy Cross. (A.R. at 41) In the press release, "Navy Cross" was crossed out, and "Bronze Star Medal" was written underneath. (A.R. at 358) The article did not reflect this change.

On April 23, 1984, the BCNR agreed to consider the additional information found and to re-evaluate Swann's claim. (A.R. at 264) On March 11, 1985, however, the BCNR denied Swann's claim a second time. (A.R. at 4–6) In a letter written to Swann, W. Dean Pfeiffer explained:

The board concedes that you may have been issued a temporary citation for the Navy Cross immediately following the events of 29 October 1944. However, the board was unable to find that the Bronze Star Medal was substituted for the Navy Cross because of your race. The board was aware that many awards which are recommended immediately after heroic acts are down-graded after a dispassionate review at a later date.

(A.R. at 6) Swann then filed a complaint in this Court on February 20, 1990, requesting a correction of his naval record and other relief.

## DISCUSSION

Based on the pleadings, there are three issues before this Court: 1) whether Swann's claim against the BCNR is barred due to sovereign immunity; 2) whether Swann's claim against the BCNR is barred by the statute of limitations; and 3) whether the BCNR's decision denying Swann relief was in error.

### Motion to Dismiss

■ When deciding a motion to dismiss, this Court must assume the truth of a plaintiff's well-pleaded factual allegations, making all possible inferences in the plaintiff's favor. *Prince v. Rescorp Realty*, 940 F.2d 1104, 1106 (7th Cir.1991); *Janowsky v. United States*, 913 F.2d 393, 395 (7th Cir. 1990). This Court may not dismiss Swann's Complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). *See also Barnhart v. United States*, 884 F.2d 295, 296 (7th Cir. 1989), *cert. denied*, 495 U.S. 957, 110 S.Ct. 2561, 109 L.Ed.2d 743 (1990). In order to prevail, the Defendant must demonstrate that "the plaintiff's claim, as set forth by the complaint, is without legal conse-

quence." *Gomez v. Illinois State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir.1987).

### Sovereign Immunity

■ In its Motion to Dismiss, the Defendant argues that Swann has failed to establish the waiver of sovereign immunity by the United States, thus denying this Court jurisdiction. However, Swann need not show that the United States has consented to be sued if he is challenging a final agency action. Under the Administrative Procedure Act, 5 U.S.C. § 702, *et seq.*, the United States waived its sovereign immunity under the following circumstances:

... An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party....

*See Dougherty v. U.S. Navy Bd. for Corr. of Naval Rec.*, 784 F.2d 499, 501 (3d Cir. 1986).

■ Thus, Swann may properly bring an action in this Court challenging the final decision of the BCNR. Money damages, however, which Swann also seeks, are expressly excluded from this section. Because Swann fails to show that the United States has consented to be sued for such damages, Swann's claim for damages must be dismissed for lack of jurisdiction. This Court has jurisdiction over Swann's claim pursuant to 10 U.S.C. § 1552.

### Statute of Limitations

The Defendant also argues that Swann's claim is barred by the applicable statute of limitations. Defendant relies on 28 U.S.C. § 2401(a), which provides in part that "[e]very civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." Defendant, however, ignores the non-monetary aspect

of Swann's claim, which challenges the final decision of the BCNR.

■ In non-monetary actions challenging a decision of the BCNR, the six (6) year statute of limitations does not begin to run until the BCNR renders its final decision. *Dougherty*, 784 F.2d at 501; *see also, Yagjiam v. Marsh*, 571 F.Supp. 698, 706 (D.N.H.1983); *Bethke v. Stetson*, 521 F.Supp. 488, 490 (N.D.Ga.1979).

■ Although it has been far more than six years since Swann first learned of the alleged naval error, Swann filed his complaint within six years of the BCNR's final ruling on his claim. Because the six-year statute of limitations did not begin to run in this case until March 11, 1985 (the date of BCNR's final decision), and Swann's Complaint was filed on February 20, 1991, his claim is not barred by the applicable six-year statute of limitations found in 28 U.S.C. § 2401(a).

*Motion for Summary Judgment*

Having determined that only Swann's monetary claim is barred by sovereign immunity, and Swann's challenge of the BCNR's final decision is not barred by the applicable statute of limitations, the final issue is whether the BCNR's decision should stand. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *First Wis. Trust Co. v. Schroud*, 916 F.2d 394, 398 (7th Cir.1990). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the Court must read all facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14; *Rich-*

*ardson v. Penfold*, 839 F.2d 392, 394 (7th Cir.1988).

The burden is upon the moving party to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, which it believes demonstrates an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. Once the moving party has met this burden, the nonmoving party may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Becker v. Tenenbaum–Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir.1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir.1989). "Whether a fact is material depends on the substantive law underlying a particular claim and only disputes over facts that *might effect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir.1988) (citing *Anderson*, 477 U.S. at 250–252, 106 S.Ct. at 2511–12).

■ A decision of the BCNR may not be overturned unless it is arbitrary or capricious, not supported by substantial evidence, or contrary to law or regulation. *See Chappell v. Wallace*, 462 U.S. 296, 303, 103 S.Ct. 2362, 2367, 76 L.Ed.2d 586 (1983); *Horn v. Schlesinger*, 514 F.2d 549, 553 (8th Cir.1975); *Henry v. Dept of Navy, Bd. for Correction of Naval Records*, 755 F.Supp. 1442, 1448 (E.D.Ark.1991); *King v. United States*, 19 Cl.Ct. 703, *aff'd*, 918 F.2d 186 (Fed.Cir.1990); *Blassingame v. Secretary of Navy*, 678 F.Supp. 416, 418 (E.D.N.Y. 1988). Swann has the burden of meeting this standard with "cogent and clearly convincing evidence." *Cooper v. United States*, 203 Cl.Ct. 300, 304 (1973). Swann must overcome the presumption that military administrators "discharge their duties correctly, lawfully, and in good faith." *Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804, 813 (1979). In considering the meaning of the "substantial evidence" standard, the Seventh Circuit states that courts

... are not empowered to rubber-stamp the Board's decision simply because the supporting evidence may be "substantial" when considered by itself and in isolation from the evidence that fairly detracts from the Board's conclusion. Rather, we must take into account the entire record, including the evidence opposed to the Board's view from which conflicting inferences reasonably could be drawn. If when so viewed in its entirety, the record contains "such evidence as a reasonable mind might accept as adequate to support a conclusion," we must accept the Board's findings. On the other hand if the record as a whole "clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of the witnesses or its informed judgment on matters within its special competence," we must set aside the Board's findings.

*American Diversified Foods, Inc. v. NLRB,* 640 F.2d 893, 894 (7th Cir.1981) (citations omitted).

■ Military Secretaries may review a serviceman's record, acting through the correction boards such as the BCNR, to "correct an error or remove an injustice" to ensure that the serviceman's record accurately reflects his military career. 10 U.S.C. § 1552 (1970); *King,* 19 Cl.Ct. at 705. A correction board acts in violation of this mandate, and thus arbitrarily or capriciously, if it does not correct blatant injustice in the record. *Id. See Skaradowski v. United States,* 200 Ct.Cl. 488, 471 F.2d 627 (1973).

■ Viewing the record in the light of the above standard of review, the BCNR's decision must be reversed as it is not supported by substantial evidence in the record.

The evidence that supports the fact that Swann was awarded the Navy Cross was best synthesized by a letter by Larry E. Dickey, a staff member from the office of Congresswoman Katie Hall. (A.R. at 196) The Court painstakingly reviewed the voluminous record in this case and finds that the following evidence indicates that Swann, indeed, was awarded or entitled to the Navy Cross:

"1. *Newspaper Article,* Evening News, Harrisburg, Pennsylvania—stating that Mr. Swann was awarded the Navy Cross, dated July 25, 1945. In the article, Vice Admiral Mark C. Mitscher, a famed commander of Task Force 58, made the Navy Cross award to Swann and cited the Steelton sailor for "distinguishing himself by extraordinary heroism in operations, against the enemy, while serving aboard an aircraft carrier. When a Japanese dive bomber attacked from the starboard side of his ship, he continued to operate his portside gun in its fire over the flight deck, although it became apparent that the enemy plane was headed directly for his gun tub. He fired his gun until a Jap plane crashed into his gun tub. The courage and skill he displayed were at all times in keeping with the highest tradition of the United States Navy." (A.R. at 423)

"2. *Newspaper Article,* New York Times, New York, New York dated July 30, 1945—stating that three area men were awarded the Navy Cross, including Swann, James Eddie Dockery, and Que Gant. (A.R. at 41)

"3. *Newspaper Article,* Evening News, Harrisburg, Pennsylvania—stating that the six Steward's Mates were awarded the Bronze Star medal. Editor's note states, "[e]arlier reports from official Navy Department sources said that the six steward's mates had been awarded the Navy Cross, but the release was withdrawn with no explanation of why the less significant Bronze Star was substituted. Consistent failure to the U.S. Armed Forces to award the higher decorations to deserving colored servicemen has been the subject of considerable public comment." The awards were reportedly made by Vice–Admiral John S. McCain. Attached with this article is also a photograph of the six Steward's Mates "who received Bronze Stars for heroism." (A.R. at 422)

"4. *Temporary Citation*—The Navy issued a temporary naval citation for the Navy Cross to Mr. Que Gant, a crewmember of the USS INTREPID's Gun Tub # 10,

and one of these six allegedly awarded the Navy Cross with Swann. The temporary citation is issued by M.A. Mitscher, Vice-Admiral, U.S. Navy, who reportedly awarded the Navy Cross medals to all six of the Steward's Mates according to The Evening News in an article dated July 25, 1945. The citation almost mirrors the quote in the paper which states why Swann was awarded the Navy Cross. (A.R. at 253)

"5. *Citation of Appreciation*—This citation was issued to Gant's family by the Mayor and City Commissioners of Atlantic City, New Jersey. It states that Gant was awarded the Navy Cross by the United States Navy and congratulates Gant's wife on the occasion of the honor accorded Gant.

"6. *Letter of Appreciation*—was issued to Gant's family for his courageous performance by the Mayor of Atlantic City, New Jersey—date May 3, 1945. (A.R. at 418)

"7. *A Personal Eyewitness Testimonial/Affidavit*—Donald W. Ickes, former Assistant to the Chaplain, aboard the INTREPID, attesting to Swann and fellow crew members valor during the attack. (A.R. at 399)

"8. *USS INTREPID Meritorious Mast*—dated February 15, 1945, states that Swann, along with his other five Steward's Mates received the Navy Cross. (A.R. at 289)

"9. *USS INTREPID Newspaper Photograph*—shows Captain J.F. Bolger, of the INTREPID, awarding Navy Cross to Eli Benjamin on December 11, 1944. The Ebony Handbook states that the Navy Cross was awarded to Eli Benjamin, a Steward's Mate in Swann's gunnery crew. (A.R. at 295)

"10. *From Slavery to Freedom*—a book which states that Steward's Mate Eli Benjamin was awarded the Navy Cross for his outstanding heroism. (A.R. at 118)

"11. *Preliminary Review of Naval Records*—written by T.R. Greer, Naval Records Examiner. Greer states that the research revealed that the nine deceased members were originally recommended for the Navy Cross, and subsequently eight of those deceased members were awarded the Bronze Star. (A.R. at 9)

"12. *Swann's Military Records*—said records show that Swann is a Negro on his medical records (A.R. at 15–18) as well as his notice of separation from service. (A.R. at 20)

"13. *Award to Eli Benjamin*—Navy states that there are no Navy records supporting the award of the Navy Cross to Eli Benjamin as evidenced by the photograph, *infra*. (A.R. at 6)

"14. *Press Release Dated July 29, 1945*—States that the six Steward's Mates, serving as gunners, were awarded Navy Crosses, the Navy's highest combat award, and that the INTREPID came to the Navy yard at Marc Island, California. In this press release "the Navy yard at Marc Island, California" was crossed out by hand and written below was "Hunter's Point, California", for repairs. Also crossed out was "Navy Crosses, the Navy's highest combat award", and "Bronze Star medals" was written in below. However, the New York Times article referred to above did not reflect these changes and stated that the INTREPID was returned to the Navy yard at Marc Island and that the six Steward's Mates received the Navy Crosses. (A.R. at 357)

"15. *Press Release Dated July 29, 1945*—this release states that six Steward's Mates were award the Bronze Star medal, and lists each of the individuals, including Eli Benjamin, that were awarded the Bronze Star. (A.R. at 359)

"16. *Blacks and the Military*—This book tracks the history of blacks in the military and how they were discriminated against, particularly in World War II:"

In the years just before World War II American blacks became increasingly concerned about the racial policies and conditions in the armed forces. Black leaders and organizations, leading black newspapers, concerned legislators, liberal coalitions, and others began to apply political pressure to break down the newly strengthened color barriers. The Selective Training and Service Act of 1940 reflected the efforts of those who pro-

moted "equality of service" by stipulating that the selection of volunteers and draftees for the armed forces should not discriminate against any person "on account of race or color." However, since the act also stipulated that volunteers be "acceptable to the land or naval forces for such training and service," the separate military departments retained "unlimited discretion" to develop their own qualification standards for enlistment.

\*    \*    \*    \*    \*    \*

Further pressure was brought to bear on President Franklin D. Roosevelt just before the election of 1940. The Roosevelt administration responded by enunciating the approved policy of the War Department, which included the following main points: (1) the proportion of blacks in the Army would be equivalent to the proportion of blacks in the general population; (2) black units would be established in each branch (combatant and noncombatant) of the Army; and (3) blacks would be allowed to attend officer candidate schools so they could serve as pilots in black aviation units. Yet the statement of policy also noted that, for the maintenance of troop morale and defense preparations, the War Department would continue "not to intermingle colored and white enlisted personnel in the same regimental organizations." Furthermore, existing black units would receive no black reserve officers other than chaplains and medical officers.

The main focus of the "Negro problem" for the War Department between 1941 and 1943 was "ensuring that Negroes represented 10 percent of the Army, the same percentage that they composed of the general population"—a goal that was never reached. Since segregation was part of American life, the Army believed that it was a fixed part of the military establishment as well. The Army position was that the military should not be a laboratory for social experimentation; integration would hurt unit efficiency and create unnecessary racial friction. Black soldiers, because of the special treatment required, were thus viewed as manpower problems rather than assets. A special study group, the Advisory Committee on Troop Policies, was eventually established in 1942 to investigate the extent of the race problem within the armed forces and to recommend appropriate action.

The policy of racial segregation and quotas also created many unforeseen administrative difficulties during the early mobilization. All-black units, for example, had to be geographically placed so as to keep objections from local communities at a minimum. Also needed were special training staffs and separate facilities; separate assignment, classification, and replacement processes to segregate units and apportion blacks to different branches; and special procedures to identify men by race in order to limit the proportion of black draftees. The Selective Service System helped solve the problem of racial identification by creating different procedures and separate calls for the induction of blacks.

The Navy and Marine Corps avoided the race issue entirely by accepting only white volunteers. This placed an added burden on the Army, which could not absorb more than its "fair share" of the nation's blacks. In 1942 the Navy relaxed its restrictions, and the Marine Corps enlisted blacks for the first time in its history. Eventually, the Navy and the Marine Corps were ordered to accept blacks through the draft, but difficulties in creating separate facilities and segregated units limited the number of blacks in these services.

(A.R. at 55)

■ When an agency does not specify the factual or legal grounds for its decision, a court cannot give as much deference to the Board's determination. *Werner v. United States*, 226 Ct.Cl. 462, 642 F.2d 404 (1981). In *Werner*, a former military officer sought to have his military records corrected so as to reflect that his unauthorized absence from duty was "unavoidable". The court held that the decision of the Army Board for Correction of Military Records (ABCMR), which denied the plaintiff's requested change in records, was not

based on substantial evidence. *Id.* 642 F.2d at 408. The court noted that the decision of the ABCMR was flawed for two reasons: First, the ABCMR did not specify the factual or legal grounds for its decision, but merely stated in perfunctory fashion that "insufficient evidence [had] been presented to indicate probable material error or injustice"; and second, there was no "satisfactory showing on the record that the [decision] was based upon a balanced consideration of all the evidence available and presented." *Id.* Thus, the court reasoned that "[w]e are compelled to look to the record without much help from the Board's [decision], and therefore, without the need to accord as great weight to its determination as we otherwise would." *Id.* (citation omitted).

Similarly, in the present case, the BCNR's decision fails to show a factual or legal basis for its decision. In the BCNR's final decision, it admitted that Swann may have been awarded the Navy Cross, but speculated that this award was only temporary in nature and was later downgraded to a bronze star. However, Swann's Navy records, which formed the basis of the BCNR's decision, show no indication that he was ever given a Navy Cross, temporary or permanent, and do not indicate any downgrade or the reason for such downgrade to a Bronze Star. Moreover, it appears that Swann and his five Steward's Mates, indeed were awarded and presented with the Navy Cross as evidenced by the picture of Captain Bolger awarding the Navy Cross to Eli Benjamin. The Navy has asserted no basis nor provided any credible evidence for taking back the awards.

The BCNR claims that the Navy Cross was an award given for individual valor, and was not intended to be awarded to a group.[1] However, the BCNR concedes that "the blanket award to all the crew members was found by the Board to have occurred because [of] . . . 'the terrifying

initial use of the new Kamakazi warfare technique in combination with the documented heroic response of the INTREPID's gunnery crew (Steward's Mates).'" (A.R. at 6)

The Court finds that the Navy Cross may properly be awarded to a group under these particular circumstances. From the Court's review of the record, it is convinced that an error has occurred, meaning the Navy Cross was awarded to Swann and he never received it, or an injustice has occurred, as Swann claims, meaning that he was awarded the Navy Cross, which was wrongfully taken away from him based on his race. As Swann has patiently waited forty-years for the return or award of the Navy Cross, this Court hereby REVERSES the decision of the BCNR and REMANDS this case to the Secretary of the Navy with instructions to award Swann a Navy Cross. *See Henry v. Department of Navy,* 755 F.Supp. 1442, 1451 (E.D.Ark.1991); *Justice v. Lyng,* 716 F.Supp. 1570, 1579 (D.Ariz.1989) (court may remand with explicit instructions).

---

1. Title 10, Section 6242 of the United States Code provides:

The President may award a Navy cross of appropriate design and a ribbon, together with a rosette or other device to be worn in place thereof, to any person who, while serving in any capacity with the Navy or the Marine Corps, distinguishes himself by extraordinary heroism in connection with military operations against an armed enemy.