Raymond E. ROBINSON, Appellant,

v.

Stanley R. RESOR et al.

No. 71-1171.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 11, 1972.

Decided Oct. 25, 1972.

Mr. Daniel J. Andersen, Washington, D. C., for appellant. Mr. Rowland W. Fixel also entered an appearance for appellant.

Mr. Stephen W. Grafman, Asst. U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., at the time the brief was filed, John A. Terry and Gil Zimmerman, Asst. U. S. Attys., were on the brief, for appellees.

Before FAHY, Senior Circuit Judge, and TAMM and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

This is an action brought by appellant Robinson to set aside an Army discharge "under other than honorable conditions" and to recover for lost earnings for the term of enlistment. The District Court granted defendant appellees' cross-motion for summary judgment on the ground "that the Army Discharge Review Board decision is fully supported by the Board's record and is in no way arbitrary or capricious." We disagree.

## I. History of the Case

On 24 June 1955 plaintiff Robinson received from the United States Army a Discharge Certificate (under other than honorable conditions). Since that time he has made repeated efforts before the appropriate military boards to have this set aside in favor of an honorable discharge.[1] In September 1966 plaintiff instituted the present litigation in the District Court, which resulted in an order remanding the case to the Department of the Army for further administrative proceedings before the Army Discharge Review Board, before whom plaintiff had twice filed applications for changing the characterization of his discharge. After a hearing, the Board entered findings and conclusions, and for the third time denied plaintiff's application. After motions for summary judgment by both parties, the District Court

---

1. Robinson's original application for recharacterization of his discharge was filed with the Army Discharge Review Board on 14 October 1957.

sustained the Army Discharge Review Board's decision.

## II. *Facts*

The following summary of the relevant facts is taken exclusively from the findings of the Board and from uncontradicted testimony consistent with the case as presented by both sides on this proceeding to review the Board's decision. We do not here overturn any of the Board's findings of fact. Rather, we find their conclusion arbitrary and capricious. The necessity for our reference to facts which are uncontradicted by both sides, but not the subject of findings by the Board merely illustrates the unacceptably narrow focus of the Board's inquiry—which produced the inequitable result requiring reversal here.

In March 1955, Raymond E. Robinson was a Chief Warrant Officer in the Regular Army, having reached this rank from the grade of Private at the end of more than ten years' service. As a member of the Corps of Engineers, Robinson had served in Korea, Germany, and in the United States. He had been cited by Lieutenant General Bruce Clarke, and other of his commanding officers, for outstanding work.[2]

Robinson was assigned to Company C, 80th Engineer Battalion at Fort Bragg, North Carolina. Not too far away was his home in Knoxville, Tennessee, where his wife operated two motels and cared for their two minor children. During Robinson's overseas service, his wife had become ill. The illness continued after his return to the United States, and she required frequent hospitalization.

Confronted with these problems, in early March 1955 Robinson applied for an honorable discharge. This request was not forwarded up the chain of command by appellant's commanding officer, apparently for the reason that, no matter how grave Robinson's personal hardships were, the commanding officer valued his services too highly to have him released.[3] This action was definitely contrary to Army Regulation 635–120 (6), and had a discernible influence on the further unfortunate course of Robinson's Army career.

In late March, Robinson's wife was entering the hospital for surgery. This necessitated someone to operate the two Knoxville motels and to take care of the two minor children. Robinson requested a leave and was granted two days beginning 24 March 1955. While in Knoxville, Robinson was unable to arrange for the management of the motels and the care of the children; hence before the expiration of his leave, through the American Red Cross on the recommendation of his wife's attending physician, he attempted to secure an extension. He was granted five days—not sufficient time for him to take care of his affairs.

Overwhelmed by the problems of his wife in the hospital, the two minor children, and the operation of two motels, Robinson made the difficult choice and did not return to Army duty until he had set his private affairs somewhat in order. He was thus wilfully and knowingly absent without leave from 1 April to 21 April 1955.

During this period he did return to Fort Bragg. On 15 April, he appeared at the disbursing office and received a pay-

---

2. Exhibit No. 3 in Robinson v. Resor, CA No. 2395–66 (hereafter Exhibit No. 3) at pp. 106–108. See also Exhibit No. 1 in Robinson v. Resor, CA No. 2395–66 (hereafter Exhibit No. 1) at p. 216.

Robinson had once previously been court-martialled. However, that was for a minor offense and did not even slow his promotion, which followed soon there-

after. See Exhibit No. 1 at pp. 224–225 and Exhibit No. 3 at p. 110.

3. Robinson's commander or commanders violated Army regulations in order to keep a good man in for the good of the service. This may have been a compliment to Robinson and for the good of the country, but it was a compliment that Robinson could ill afford to accept.

ment of $100.00. While this transaction was not made the subject of findings by the Army Discharge Review Board, there is absolutely no evidence in the record to show that either Robinson or the finance personnel were aware that drawing these funds was in any way improper. On 22 April when Robinson was advised after his return that it was against regulations to draw funds while in an AWOL status, he immediately repaid the $100.00.

On 21 April Robinson returned to Fort Bragg voluntarily. He was immediately placed under restrictions in a "secured room," and handed general court-martial charges for (1) being absent without leave for 20 days, (2) larceny of $100.00 in Government funds on 15 April, and (3) making a false and fraudulent claim for this $100.00 in payment for services during the period he had been absent without leave. An investigation of these charges was commenced on 23 April, and counsel, in the person of First Lieutenant O. B. Crowell, was appointed on Robinson's behalf.

The mental strain resulting from the illness and hospitalization of Robinson's wife, his business and financial problems, and the culminating blow of these charges, caused Robinson to have a mental and nervous collapse requiring hos-

pitalization from 24 April to 5 May. During the time in the hospital, he was given psychiatric care. In a report filed on 5 May 1955, 1st Lt. Lloyd J. Paul, an Army psychiatrist, concluded that Robinson's hospitalization had been produced by his having suffered "a dissociative-like state, recurrent, with paranoid features, largely as a result of the stress of impending court-martial action, sickness in the immediate family, and the sudden drying out from relative chronic intoxication." However there was "no evidence that such episodes . . . [had] . . . occurred at any time prior to 24 April 1955 or since 27 April 1955."

On 5 May 1955, while completing his psychiatric treatment, Robinson signed a letter of resignation for the good of the service.[4] At about 7:00 p. m. on that day he was released from the hospital and returned to his company.

On 6 May 1955, Major Hale, the investigating officer, resumed his pre-trial investigation, which had been postponed during Robinson's illness, with appellant and his appointed counsel present. A *copy* of the letter of resignation of 5 May was apparently handed to Major Hale at this point. Although there were witnesses to be questioned, Robinson inexplicably waived presence of his de-

---

4. The letter read as follows:
COMPANY "C"
80TH ENGINEER BATTALION
(CONSTRUCTION)
Fort Bragg, North Carolina
5 May 1955
SUBJECT: Resignation
THROUGH: Channels
TO: The Adjutant General,
Washington 25, D.C.
1. Under the provisions of paragraph 4, AR 635–120, I, Raymond E. Robinson, Chief Warrant Officer, United States Army W2151840, hereby voluntarily tender my resignation from the Army for the good of the service in lieu of trial by courtmartial.
2. I understand that this resignation, if accepted, will be considered as under other than honorable conditions and that a Discharge Certificate (under other

than honorable conditions) (DA Form 399) will be furnished.
3. I further understand that if my resignation is accepted under other than honorable conditions I will not be entitled to mustering-out pay, compensation for unused accrued leave, transportation of dependents and household goods, physical disability, retirement benefits, or severance pay, and that I may be barred from all rights, based upon the period of service from which I will be separated, under any laws administered by the Veterans Administration, except War Risk, United States Government (converted), or National Service Life Insurance policies which I now hold.
/s/ Raymond E. Robinson
RAYMOND E. ROBINSON
CWO                    USA

fense counsel during the rest of the investigation, and Lt. Crowell then withdrew. After all the witnesses in support of the court-martial charges offered their testimony, Robinson was asked whether he desired to make a statement in his own behalf. At this time Robinson offered the statement dated 6 May, which had been typed for him by his company clerk that same morning.[5] Major Hale concluded his investigation and sent in his report the following day, 7 May. In the fullness of time, Robinson's discharge was issued.

### III. *The Resignation*

The Army bases its action in giving Robinson a Discharge Certificate under other than honorable conditions on AR 635–120 and the letter of resignation, signed by Robinson, dated 5 May 1955. Despite the many years of attempts to discover exactly when and how the resignation was obtained and submitted (or perhaps because of those many years), some doubt remains on the significant facts surrounding the signing and delivery of this letter. Robinson's story is that an officer, whose identity he cannot now remember, approached him in the hospital on 5 May, suggested that he sign the pre-typed letter, and took it away once the signature had been obtained. The Army contends that Robinson handed over his resignation letter to the investigating officer, Major Hale, with counsel present, on 6 May. Neither ver-

sion would establish a violation of regulations, but the Army's actions look considerably less deliberate and equitable if Robinson's story is believed.

While there is no specific Board finding on this conflict over the evidence, we think there is implicit acceptance of Robinson's theory as to *when* the resignation was submitted in the Board's finding that Major Hale was presented with a *copy* of the resignation on 6 May.[6] Other uncontradicted evidence supports the conclusion that Robinson effectively submitted his resignation on 5 May, when he was still in the hospital and before the pre-trial investigation of the charges against him had been reconvened. Prior to his release from the hospital, the Army psychiatrist recommended that Robinson "return to duty *for separation under provisions of AR 635–120.*" This final recommendation indicates that the psychiatrist was aware of Robinson's resignation under AR 635–120 as of 5 May.

In addition, Lt. Col. (then Major) Hale, whom the Board believed, testified that he attached the resignation letter he received to his investigation report. However, the *original* of the letter was forwarded the same day with Robinson's commanding officer's first endorsement.[7] In short, we think the conclusion inevitable that the resignation reached Robinson's commanding officer (Lt. Overby) as a result of its effective submission by Robinson, in the hospital, on

---

5. This consisted of two paragraphs, the first reciting extenuating circumstances in regard to his being absent without leave, *i. e.*, the illness of his wife, his two children, the business affairs of the two tourist courts, etc. The second paragraph began:

> To the second and third charges I did not know that I was breaking any regulation in accepting a partial pay, which I immediately repaid to the finance officer on being informed due to the circumstances it was not due me (Receipt enclosed). . . . After checking all evidence, statements, and rec-

ords, due to the circumstances under which this occurred request if my resignation is approved that if possible it not be under dishonorable conditions. Appendix (hereafter "App.") at p. 20.

6. App. at p. 22.

7. Lt. Col. (then Major) Hale himself, the most credited witness, confessed that he could not explain this anomaly. Proceedings of the Army Discharge Review Board, 29 July 1969, Exhibit No. 5 in Robinson v. Resor, CA No. 2395–66 (hereafter "Exhibit No. 5") at p. 28.

5 May.[8] Once that version is accepted, the precise method in which Major Hale obtained a copy has no particular relevance.

The secondary question of *who* appeared at the hospital to obtain the resignation cannot now be satisfactorily resolved. However, it would be unreasonable to contend that Robinson personally initiated, or even understood the significance of, that confrontation.

The question remains clouded in part because most of the likely candidates were unavailable to testify. Major Hale could not have been the mysterious visitor,[9] but Lt. Overby or Lt. Col. Carroll (Robinson's battalion commander) might have been. They did not appear before the Review Board.

On oral argument to this court, the Government suggested that the visitor could have been Robinson's own counsel, Lt. Crowell. We find that suggestion unlikely in light of the fact that the letter is typed on battalion stationery.[10] However, even if true, that scenario would merely enhance our doubts about the adequacy of Robinson's Army-furnished counsel. It would certainly not remove the inequity of granting a less than honorable discharge under all the circumstances of this case.

IV. *The Army Discharge Review Board's Decision*

■ The Government appellees urge that "this court, on properly limited ju-

dicial review should readily sustain the Board's decision as having rational support in the certified Army records and as being in no way arbitrary or capricious." We agree that there is limited judicial review of the military service's action, and that the Government has stated the proper standard for our judicial review. But what the Board has done here is to make a meticulous point-by-point examination of each officer's action at a given moment, concluded that such action was proper and defensible within regulations and the area of discretion of that officer, and after focusing microscopic attention on every scrap of minutiae, validated and revalidated the final discharge decision—a decision which, taken in overall perspective, we find is indefensible by any acceptable standard of due process and elemental justice.

■ We think that there was lacking in this case both procedural due process and substantive justice, and therefore that the ultimate decision of the Army Review Board declining to alter the character of appellant Robinson's discharge was arbitrary and capricious. We must agree with the Review Board as to each specific finding on the technical aspects of this case. However, we must also note what the Board failed to consider.

1. We agree that Robinson's testimony has not always been clear or consistent.[11] We also have grave doubts about the Board's use of that fact to to-

---

8. Robinson testified that the company clerk, Corporal Cowan, sought him out with regard to the resignation and helped prepare the statement dated 6 May. Exhibit No. 5 at p. 54. That could only have happened if Corporal Cowan had seen the resignation letter, and perhaps typed Lt. Overby's endorsement, on the *morning* of 6 May (before the investigation began). In the absence of a finding by the Board on the issue, and given the Board's analysis of Robinson's credibility, we cannot specifically rely on this testimony as accurate. We merely note it as an additional indication that the effective resignation took place in the hospital on 5 May.

9. Lt. Col. Hale's affidavit and oral testimony are unequivocal that he never saw Robinson from the time he entered the hospital until the morning of 6 May 1955, after he had left the hospital. See Exhibit No. 5 at pp. 106–107.

10. Robinson's appointed defense counsel for the court-martial charges, Lt. Crowell, was from the staff of the Fort Bragg Headquarters Judge Advocate Section, and not from Robinson's engineering unit.

11. Over the years Robinson's testimony in regard to the circumstances of his signing this letter of resignation has been inconsistent and contradictory in the dif-

tally discredit his testimony. Rather, such confusion would seem to be the natural and predictable state of mind concerning a period when the rush of adverse events and hostile actions drove Robinson into serious mental problems.

2. We agree that the battalion, rather than the hospital, had disciplinary jurisdiction over Robinson when the resignation was submitted on 5 May.[12] We cannot approve the manner in which that jurisdiction was exercised.

3. We agree that Robinson was under charges sufficiently serious to justify dismissal, as required by AR 635–120(4)(a) to support a resignation for the good of the service. We cannot support the Board's total failure to consider whether any substantial evidence existed to back up those charges. Twenty days AWOL, standing alone, could clearly not be serious enough, as a practical matter, to justify the Army's action here. The theft and fraud charges, serious on their face, are *nowhere* supported by *any* evidence of the necessary element of intent. While we cannot now decide whether those charges would have led to conviction, the absence of any serious substantiation should have been considered as bearing on the Army's justification for such harsh measures. Given the chances of acquittal, Robinson's resignation also calls into question his actual ability, even with the "assistance"

of counsel, to protect his own best interests at that time.

4. We must accept the Board's findings that there was no outright coercion of the resignation,[13] that Robinson had time to consider his actions,[14] that he was legally competent,[15] and that he was represented by counsel.[16] We cannot uphold the refusal of the Army and the Board to weigh the other pressures which obviously affected the soundness of Robinson's judgment. For valid personal reasons, he wanted very badly to get out of the Army. He had requested such relief as early as March, with no success.[17] As the Board notes, he had notice of the charges twelve days before his resignation. The Board fails to mention that many of those days were spent in deep mental shock. We trust that where military operations are concerned an officer's decision-making capacity is evaluated differently. He was officially certified sane on 5 May. However, he was also clearly acting unwisely and under pressures that had recently threatened even his grip on reality. While counsel was present at various points, that fact does not absolve the Army from all further duties to Robinson. Rather, allowing him to act the way he did calls the adequacy of such representation into question.

5. We agree with the finding that the resignation was properly forwarded under Army regulations [18] and that the

ferent hearings before the Army Review Board. At various times Robinson testified that he never signed the letter, that he was persuaded to sign it by Lt. Col. (then Major) Hale, the court-martial investigating officer, or by Overby, his company commander. In the final hearing, whose findings and conclusions the District Court declined to set aside, Robinson testified that the unidentified officer who presented him with the letter of resignation said that Colonel Carroll, his battalion commander, was pushing this, that it was either this or face a court-martial. The Board noted these inconsistencies in its findings. App. at pp. 22–23.

12. App. at p. 21.

13. App. at pp. 22–23.

14. App. at pp. 22–24.

15. App. at pp. 24–25.

16. App. at p. 22.

17. It should be noted that Robinson's prior application for an honorable discharge could easily have led him to believe that the discharge now being offered, in lieu of court-martial on a charge he believed frivolous, was the same sort of discharge that he had previously requested. Without holding that this was true, we simply note that there were reasonable explanations for his failure to fully appreciate the significance of the letter he was signing.

18. App. at pp. 22 and 24.

6 May statement was not technically a revocation of his resignation.[19] We cannot condone the Board's determined effort to overlook the fact that Robinson's earlier request for a discharge under honorable conditions had not been properly forwarded. If it had been, the unfortunate predicament which led to his second resignation might never have arisen. Further, while the 6 May statement was merely in mitigation, the glaring fact remains that, on the whole record, the Army *should* have heeded Robinson's plea.

### V. Conclusion

In short, neither the Army nor the Review Board has ever considered that a little more compassion, a little more interest in Robinson's welfare, could and should have prevented him from renouncing all the benefits which were due to him for 10 and ½ years of honorable service at home and abroad.[20] From Robinson's point of view, he requested nothing more than the money and released time rightly due after all the effort he had expended for the good of the service. Instead, he received abrupt dismissal and years of life under a stigma totally out of proportion to the totality of circumstances surrounding this case.

We hold that the relation of the Government to its soldiers, both as to the substantive decisions on their status and the procedures used to arrive at those decisions, must be, "if not paternal," "at least avuncular."[21] Substantial fairness, rather than nitpicking compliance with precise regulations, must guide the Army's actions. The Army must not be allowed to reach, step by technical step, a result which, viewed in its entirety, constitutes an overreaching leap into the arbitrary and inequitable.

In a time when the Army is attempting to demonstrate its attractiveness as an employer, and to enlist volunteers confident that they will receive fair treatment, we cannot see how allowing this less than honorable discharge to stand would in any conceivable way be "for the good of the service." The Army could not isolate itself from the accepted standard of justice in the civilian world when it was a conscript force; still less can it—or should it wish to—live by a different standard when it plans to become an all volunteer Army. Until it is finally set right, the case of Chief Warrant Officer Robinson will be no boon to recruiting sergeants.

19. Appellant contends that the document of 6 May entitled "Statement" was meant as a revocation of his resignation letter, and Robinson testified that indeed that is what he requested Cpl. Cowan to type. If so, AR 635–120 requires such a revocation or withdrawal to be forwarded through the same command channels as the original resignation. The Board found that the 6 May document was not a revocation of the resignation, but was a statement in explanation and mitigation of the charges. App. at p. 25.

20. Far from such sentiments, there is some evidence in the record that the Army was in fact acting out of pure institutional self-interest and possibly even out of spite. Robinson's unique talents as an engineer were apparently valued in connection with the construction of a new airstrip at Fort Bragg. This factor may well have motivated the denial of sufficient leave and the refusal to forward his first request for a discharge. There is further evidence that the time

he did spend away from the Army forced less competent construction efforts by other officers—resulting in a defective airstrip which caused a crash in which two men died. This latter event may further explain the Army's sudden change of heart in seeking the hasty discharge of a previously valued officer. See Proceedings of the Army Discharge Review Board, 27 May 1958, Exhibit No. 2 in Robinson v. Resor, CA No. 2395–66, at pp. 4 and 20. In light of the Board's failure to even mention this background situation, we cannot base our result on a finding to that effect. However, we also cannot entirely ignore the existence of evidence which might explain an otherwise strange shift in the Army's evaluation of Robinson and which hints at improper motives for his unusually harsh treatment.

21. White v. United States, 270 U.S. 175, 180, 46 S.Ct. 274, 70 L.Ed. 530 (1926) (Holmes, J.).

■ Accordingly, the case is remanded to the District Court for the entry of an appropriate order insuring that appellant Robinson will not be given a discharge under other than honorable conditions[22] and for further proceedings, either in the District Court or before the appropriate Department of the Army agency, in regard to appellant's monetary claims.

So Ordered.

22. Although, on the record in this case, Robinson appears to us to be a deserving candidate for an honorable discharge, the Army Discharge Review Board must make that determination in the first instance. If the Board grants a general discharge, it must accompany that decision with the specific statement of the basis therefor required by 32 C.F.R. § 41.7(b).

In contrast to the necessity for remand here, see Hoskin v. Resor, 324 F.Supp. 271 (D.D.C.1971). There the District Court directly ordered that honorable discharges be issued. However, that case concerned the status of the Plaintiffs as either civilian government employees or members of the Regular Army. In opposition to a motion for summary judgment granting declaratory relief (including a declaration that honorable discharges were warranted), the Government merely claimed that plaintiffs were not military personnel, never suggesting that anything marred their service records. Once the court determined that plaintiff's military status justified their claim for discharge, absolutely no basis existed for denying their claim that honorable discharges should issue.