Ronald Eugene HENRY, Plaintiff,

v.

DEPARTMENT OF the NAVY, BOARD FOR the CORRECTION OF NAVAL RECORDS, Defendant.

Civ. No. LR-C-88-519.

United States District Court,
E.D. Arkansas, W.D.

Feb. 5, 1991.

William F. Sherman, Jacoway, Sherman & Pence, Little Rock, Ark., for plaintiff.

Charles Banks, U.S. Atty. by Richard M. Pence, Jr., Asst. U.S. Atty., Little Rock, Ark., Bhard Clemmons, Office of the Judge Advocate Gen., Alexandria, Va., for defendant.

## MEMORANDUM OPINION AND ORDER

GEORGE HOWARD, Jr., District Judge.

Plaintiff brings this action for mandamus and injunctive relief, pursuant to 28 U.S.C. §§ 1331 and 1361, requesting that the

Court require the Department of the Navy to upgrade plaintiff's 1969 undesirable discharge from the United States Marine Corps. Plaintiff also seeks a declaratory judgment that his constitutional right to due process was violated. After denying defendant's motions to dismiss and for summary judgment, the Court conducted a hearing at which the parties presented additional evidence to that in the administrative record.

## FACTUAL BACKGROUND

On July 31, 1968, plaintiff enlisted in the United States Marine Corps.[1] On February 5, 1969, following completion of his required training, plaintiff reported to the Communications Company, Headquarters Battalion, Second Marine Division, Camp Lejeune, North Carolina.

On February 10, 1969, plaintiff received a nonjudicial punishment for an unauthorized absence and a violation of a lawful order. Plaintiff testified that he was late returning to Camp LeJeune by 16 hours, caused primarily by his arrest in Jonesboro, Arkansas for a speeding violation.

Plaintiff was transferred from Camp Lejeune to First Marine Division (REIN), Republic of South Vietnam, where he arrived on April 26, 1969.

On June 9, 1969, while assigned to the Communications Company, Headquarters Battalion, First Marine Division, plaintiff was referred for a psychological evaluation

for reported anxiety related to racial problems.[2] Plaintiff also requested a transfer to the infantry battalion, which the evaluator thought might be beneficial. The evaluator noted the plaintiff displayed anxiety and depression, and found plaintiff had "apparent passive-aggressive traits." The evaluator found that plaintiff was not psychotic.

On August 27, 1969, plaintiff was convicted by summary court-martial for assaulting a corporal on August 4, 1969, by striking him in the head with a length of chain. Plaintiff's rank was reduced to private, and he had to forfeit $80.00 in pay for one month.

Plaintiff went on unauthorized absence (UA) soon after receiving the summary court-martial. Plaintiff testified that he was upset because he believed the corporal he had hit had not been punished although plaintiff claims that he was attacked by the corporal first. Plaintiff returned to duty on September 30, 1969. At that time, his commander, Captain Sheridan, placed him in hootch arrest.

According to an entry dated September 30, 1969, on the Unit Punishment Book, plaintiff was charged with unauthorized absence from September 4 to September 5, 1969 and September 9—30, 1969. Plaintiff signed the document on September 30, 1969, which also contains the notation that it was referred to special court-martial on September 30, 1969.[3]

1. Plaintiff attempted to assert that he was enlisted as part of "Project 100,000", a Vietnam War program designed to permit the annual induction of 100,000 men who would not have been accepted because of their limited educational background and low aptitude scores. Between 1966 and 1976, about 311,000 recruits entered military service because of the lower aptitude standards under Project 100,000. M. Eitelberg, *Manpower for Military Occupations* (1988), at 172–73 (hereinafter Eitelberg). While Project 100,000 broadened the wartime manpower supply, it has been severely criticized and considered a failure in its social welfare goals of providing training opportunities for the nation's "culturally deprived." Critics note that Project 100,000 enlistees were the first to be sent to Vietnam, the last to be promoted, and received more than their share of bad discharges. Eitelberg at 180.

   The Court cannot say, based on the record before it, that plaintiff was recruited under

Project 100,000. The record does reveal, however, that plaintiff scored 18 (out of 100) on the Armed Forces Qualification Test (AFQT), or in the 6th lowest category (of eight categories). Furthermore, the Court notes that a test score below 10 disqualifies an applicant from consideration. Since 1984, the Marine Corps has recruited a small percentage of personnel with scores lower than 31 on the AFQT.

2. At the hearing before the Court, plaintiff testified about the hostile racial atmosphere among the troops in Vietnam. Two officers who served with the Marines in Vietnam during the 1960s also testified about the racial conflict that existed in Vietnam.

3. A form from the Unit Punishment Book indicates that plaintiff received some sort of notice on October 3, 1969. It is unclear from the form whether the notice was merely the entry in the Unit Punishment Book of the charges.

On October 1, 1969, plaintiff was referred for psychiatric evaluation for "mental problem". Captain Sheridan informed the intake person that plaintiff had been extremely uncooperative since returning from UA. Plaintiff was to be evaluated for confinement in the brig as well as for psychiatric treatment.

The evaluator did not find any evidence of psychosis. The evaluator found plaintiff to be frustrated and angry, with passive-aggressive traits. The evaluator also stated that at this point he did not feel a discharge on a psychiatric basis would be appropriate.

The next day, October 2, while under hootch arrest plaintiff got in a fight with a corporal. According to plaintiff, while sitting on the edge of his bed, writing to his mother, plaintiff was approached by another Marine, off-duty, who had been engaged in a party at the end of the barracks. Plaintiff testified that the other Marine invited him to join the party. Plaintiff declined, stating that he did not drink. Later, the Marine returned and insisted that plaintiff join the party. When plaintiff again declined, the other Marine returned with a whiskey bottle in his hand, and swung it at plaintiff. Plaintiff claims he grabbed his M-16 rifle and struck the Marine across the face in self-defense.

Plaintiff was confined to the brig on October 4. On October 4 and 5, 1969, plaintiff wrote letters to his mother which are contained in plaintiff's personnel file. The letter dated October 4, 1969, states that plaintiff was supposed to have a special court-martial on October 15. The records do not indicate that a court-martial had been set for that date.

Medical records from October 13, 1969, reveal that plaintiff was complaining of headaches. Plaintiff also stated that he

heard his mother's voice at night, which kept him awake. The physician opined that plaintiff was "malingering."

Plaintiff was released from confinement on October 18, 1969, following Request Mast with his Battalion Commander. Plaintiff contends that Captain Sheridan informed plaintiff that he had a trial date of November 5, 1969. Again, there is no official documentation in the record indicating that the date for a special court martial had been set.

During October of 1969, plaintiff's mother, Lula Mae Colclough, wrote several letters to congresspeople and the President of the United States requesting assistance for her son and information concerning the pending court-martial. Captain Sheridan wrote Ms. Colclough a number of times, informing her of plaintiff's status.

On October 3, 1969, Captain Sheridan wrote Ms. Colclough that plaintiff had returned from Unauthorized Absence on September 30, 1969. Captain Sheridan stated that a preliminary investigation was being conducted to determine the circumstances surrounding plaintiff's absence and the October 2 assault. Captain Sheridan noted that upon completion of the investigation, a recommendation "will be submitted recommending appropriate disciplinary action." Captain Sheridan then states that plaintiff "could possibly be tried by Special Court–Martial for unauthorized absence and assault."

In a letter dated October 23, 1969, Captain Sheridan advised plaintiff's mother that plaintiff was awaiting trial for two violations of Article 86 and stated that plaintiff was also charged with two violations of Article 92 and Article 128, 10 U.S.C. §§ 886, 892, 928.[4] The letter states that no date has been set for trial, but that he has been assigned defense counsel.

---

Plaintiff signed item No. 6 on the form on September 30, 1969, which states: "I have been advised of and understand my right to demand trial by court-martial in lieu of non-judicial punishment. I do not demand trial and will accept non-judicial punishment subject to my right to appeal."

Obviously, plaintiff was not waiving any rights concerning the subsequent October 1 and 2 charges. Furthermore, there is no indication

that those later charges were referred to special court-martial. See Discussion infra.

**4.** According to the Unit Punishment Book plaintiff was charged with violation of Article 92 for failure on two occasions to obey a lawful order issued by his superior to pick up his gear on October 1, 1969. In addition, he was charged with violation of Article 128, for committing an assault on Corporal Yardy.

Thus, as of October 23, 1969, plaintiff appears to have been awaiting trial only for the unauthorized absence charges.

In his letter dated October 28, 1969, Captain Sheridan stated that plaintiff's Special Court–Martial for the unauthorized absence, disobedience of direct orders and assault was scheduled for trial on November 5, 1969. Captain Sheridan stated that he had spoken to plaintiff several times and added that 1st Lt. James Schermerhorn was assigned to plaintiff as his defense counsel.

The personnel file, which was available to the BCNR and NDRB, contained the letters from plaintiff's mother as well as Captain Sheridan's responses. Senator Fulbright wrote a letter to the Commandant of the U.S. Marine Corps on October 20, 1969, seeking information about the charges pending against plaintiff. R.J. Dove, Captain, U.S. Marine Corps, Head of the Legal Action Section of the Judge Advocate Division Letters, in letters to Senator J.W. Fulbright and to plaintiff's mother dated October 31, 1969, stated that the records did not contain sufficient information about the charges.

Plaintiff testified that during the time he was under arrest he was visited daily by two men who urged him to sign a waiver of court-martial. He never spoke to Lt. Schermerhorn. Plaintiff contends that he wanted to proceed to trial. November 5 came and went, and plaintiff did not receive word of any court-martial proceedings. On November 12, 1969, believing that he had no other option, plaintiff signed a document entitled Request for Undesirable Discharge for the Good of the Service to Escape Trial by Court–Martial, in which he purportedly waived his right to court-martial in exchange for receiving an Undesirable Discharge ("UD").[5] The form was witnessed

5. The Form contains the following relevant language:

1. Article 31, UCMJ, having been read and explained to me, and with full understanding of my rights, I hereby request discharge for the good of the service pursuant to the provisions of paragraph 6021 of reference (a).

2. This request is based on my commission of the following offense(s) in violation of Article(s) 86, 91, 92 and 128, Uniform Code of Military Justice; was UA from 9 September to 30 September 1969 and 4 September to 5 September 1969; willfully disobeyed an order of my superior Non-commissioned Officer on 1 October 1969; violated a lawful general order on 2 October 1969; committed an assult [sic] on a Non–Commissioned Officer by hitting him in the face with a rifle and broke his nose. I understand that my commission of the following offense(s) renders me triable by court-martial and that a maximum permissible punishment for such offense(s) includes a Bad Conduct Discharge.

3. Prior to submitting this request I have been afforded the opportunity to consult with counsel and I have consulted with the following counsel and I am entirely satisfied with their advice:

| RANK | NAME | SERNO | COMP |
|---|---|---|---|
|  | Michael P. MERRILL | 08988/4405 | USMCR |
| Captains | William E. IORIO | 089821/4405 | USMCR |

(lawyers certified in accordance with Art. 27b, UCMJ)

4. I understand that my discharge from the Naval Service, effected by acceptance of this request, will be with an Undesirable Discharge which will be issued without referral to or consideration of my case by an Administrative Discharge Board. I understand that an Undesirable Discharge is a discharge under other than honorable conditions and that as a result of such discharge I may be deprived virtually of all rights as a veteran under both Federal and State Legislation, and that I may expect to encounter substantial prejudice in civilian life in situations wherein the type of service rendered in any branch of the Armed Forces or the character of the discharge received therefrom may have a bearing.

5. My counsel has explained to me and I fully understand the purpose and scope of the Navy Discharge Review Board and the Board of Correction of Naval Records. He has further advised me of my rights under the provisions of subparagraph 6025.1a of reference (a). I hereby waive all of my rights enumerated under this subparagraph. He has further advised and explained to me that if this

by Captains Merrill and Iorio, two attorneys who defendant states were appointed to represent plaintiff.

On November 15, 1969, plaintiff's discharge from the Marines under less than honorable conditions was approved, and on November 25, 1969, plaintiff was discharged.

## PROCEDURAL HISTORY

Almost immediately after being discharged, plaintiff began his lengthy journey to have the discharge upgraded. Plaintiff's personnel file contains a number of letters from Representative Wilbur D. Mills concerning the type of advice plaintiff received.

In letters dated December 10 and 11, 1969, Brigadier General Duane L. Faw, Director of the Judge Advocate Division, advised Senator J.W. Fulbright and Representative Mills of the circumstances surrounding plaintiff's discharge. Of interest is the following paragraph contained in both letters:

request is approved, that I will receive a discharge under other than honorable conditions without Administrative Discharge Board action and the possible consequences thereof. As stated in paragraph 4 above, I fully understand the effect of this request.

/s/ Ronald E. Henry<br>Signature

Witnessed:

/s/ Michael P. Merrill
Capt USMCR
Judge Advocate

/s/ William E. Iorio
Capt USMC
Judge Advocate

Mr. Henry was subsequently charged with two specifications of assault, two specifications of failing to obey a lawful order issued by a superior noncommissioned officer, and unauthorized absence from 4 to 5 September and from 9 to 30 September 1969. These charges were referred to trial by special court-martial, but before the court-martial could convene, Mr. Henry submitted a request to be administratively discharged from the Marine Corps in lieu of being subjected to trial by court-martial.

By letter dated February 23, 1970, Representative Mills forwarded plaintiff's request to upgrade his discharge to the Board for Correction of Naval Records (BCNR). As plaintiff had not exhausted his administrative remedies, BCNR forwarded the request to the Naval Discharge Review Board (NDRB).[6] On March 4, 1971, the NDRB issued its decision that no change, correction, or modification was warranted with regard to plaintiff's discharge.

On October 31, 1975, plaintiff was granted a full pardon by direction of the President of the United States, as provided under Presidential Proclamation 4313 of September 16, 1974. On May 13, 1976, plain-

**6.** An aggrieved member of the military has two avenues to seek correction of his or her military record. The NDRB is comprised of five military officers empowered to review, and, if necessary, reclassify discharges awarded other than by a general court-martial. The actions of the NDRB are subject to review.

The BCNR is made up of civilian personnel appointed by the Secretary of the Navy. It can actually change a service member's records where "necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a). *See* 32 C.F.R. § 723.1 *et seq.* (1988) (these were the regulations in effect during the time the BCNR reviewed plaintiff's application). The BCNR typically hears cases where the NDRB has already denied relief. *Blassingame v. Secretary of the Navy*, 866 F.2d 556, 558 n. 2 and 3 (2nd Cir.1989).

tiff received a clemency discharge from the Armed Forces of the United States.[7]

In July, 1977, plaintiff's application was considered under the DoD (Department of Defense) Discharge Review Program (Special). Plaintiff raised several mitigating factors which he urged the Special Discharge Review Program to consider including: (1) completion of alternate service under Presidential Proclamation 4313; (2) age and aptitude at time of discharge; (3) deprived background; and (4) personal distress and racial discrimination. The record does not reflect what consideration, if any, the NDRB gave to these factors. A checklist prepared for the DoD Discharge Review Program (Special) reflects that the review panel did not consider age, general aptitude, deprived background, and personal distress as mitigating factors for an upgrade. The Review Board's Statement of Findings, Conclusions and Reasons include a finding that the Board determined that the compelling reason for not granting an upgrade was that plaintiff "assaulted his superior NCO with a rifle, breaking his nose." [8]

On September 12, 1979, plaintiff submitted a second request to the NDRB requesting that his discharge be upgraded, alleging improper counsel and racial discrimination. Plaintiff appeared at a hearing with counsel and his wife. He told the DRB that he agreed to request the undesirable discharge for the good of the service ("UD/GOS") only after he was not brought to trial on the scheduled date of "6 November 1969"[9] and only after his counsel had

informed him that his discharge would be upgraded in six months.

The NDRB found that plaintiff's contention that he had been given improper counsel could not be accepted as a sufficient reason for a change in the discharge. The NDRB found that plaintiff had failed to present evidence which rebutted the presumption of regularity that the performance of government officials associated with the discharge action was correct and proper. The NDRB further found that the Presidential Pardon plaintiff received did not support a change in the character of the discharge.

By letter dated April 11, 1980, the NDRB informed plaintiff of its decision.

On October 16, 1981, the Disabled American Veterans forwarded to the BCNR an application to upgrade plaintiff's discharge to a medical retirement. Plaintiff claimed that his medical condition at the time of discharge was the sole reason for the action causing his discharge.

In accordance with 10 U.S.C. § 1552 and BCNR policy, this request was forwarded to the Central Physical Evaluation Board (CPEB) for review and recommendation. The CPEB found no basis for a medical discharge and recommended denial of the request on November 21, 1981. The BCNR forwarded the CPEB's recommendation to plaintiff's representative and plaintiff was afforded an opportunity to respond to or rebut the recommendation.

The BCNR reviewed plaintiff's record, and by letter dated January 20, 1982, the

---

**7.** The full pardon pertained only to violations of Articles 85, 86, or 87 of the Uniform Code of Military Justice, 10 U.S.C. §§ 885, 887 between August 4, 1964 and March 28, 1973.

According to 32 C.F.R. § 724.112 (1990), the clemency discharge was created by President Nixon on September 16, 1974, in his Proclamation 4313, "Announcing a Program for the Return of Vietnam Era Draft Evaders and Military Deserters." "Upon issuance as a replacement for an undesirable discharge or a punitive discharge, a clemency discharge serves as a written testimonial to the fact that the individual has satisfied the requirements of the President's program ..." It is a neutral discharge, and does not effect a change in the characterization of an individual's military service, nor does it change

or in any way modify an individual's past military record.

**8.** According to the testimony at the hearing, the corporal who was hit was not plaintiff's superior or in the chain of command, but was a driver for the General.

**9.** Plaintiff's contention that the trial date was November 6, 1969, is at odds with earlier and later assertions that the date was November 5, 1969. Neither the NDRB nor the BCNR addressed the disparity, which lends credence to plaintiff's arguments that he did not receive proper notice of any court-martial proceeding, and that in the absence of such, he believed he had no alternative but to sign the waiver. *See* Discussion *infra.*

Executive Director of the BCNR informed plaintiff that the BCNR denied plaintiff's application, finding that there was insufficient evidence to indicate probable material error or injustice.

On July 23, 1986, plaintiff filed a second application for correction of records with the BCNR. In that application he again contended that his constitutional rights were violated. In his letter to the BCNR dated June 29, 1987, plaintiff alleged the following as the bases for granting his application: (1) No Convening Order (i.e., no record of any proceedings pertaining to the court-martial); (2) Not permitted counsel or trial in violation of his Sixth Amendment rights; (3) Illegal waiver; (4) Violation of due process; (5) No counsel; (6) Ineffective counsel; (7) Coercion; (8) Command influence; (9) Procedural errors in the special court martial proceedings; and (10) Failure of the DRB to give fair review of the case.

The BCNR considered plaintiff's application for corrective action in executive session on September 2, 1987. The BCNR, after reviewing the record and considering plaintiff's contentions, issued its decision on September 16, 1987, denying plaintiff's application. The BCNR noted that even if plaintiff's allegation that his November 5, 1969, trial was postponed were true, it did not establish an error or injustice. The BCNR reasoned that the delay actually worked an advantage to plaintiff because he was able to request and receive an administrative discharge. The BCNR concluded that plaintiff was accorded full administrative due process during the discharge proceedings, and that there was no evidence that plaintiff was coerced into requesting an UD.

On November 1, 1987, plaintiff requested reconsideration of his application by the BCNR. The Executive Director, in his letter to plaintiff dated November 16, 1987, denied plaintiff's request on the grounds that plaintiff had failed to produce any new material not previously considered by the BCNR.

Plaintiff filed a *pro se* complaint on August 1, 1988, seeking an upgrade in his discharge. Pursuant to plaintiff's request, counsel was appointed to represent him. The Court denied defendant's motion to dismiss and for summary judgment on September 13, 1989.

## ANALYSIS

■ The Court's function in this case is to determine whether the decision of the BCNR was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 2367, 76 L.Ed.2d 586 (1983); *Blassingame v. Secretary of the Navy,* 866 F.2d 556, 559 (2nd Cir.1989).

In order to better understand the basis of plaintiff's claim, a brief review of the applicable statutes and regulations is necessary. At the time of plaintiff's discharge, the regulations authorized five categories of discharge: honorable, general, undesirable, bad conduct, and dishonorable. 32 C.F.R. § 730.51 (1969). The dishonorable discharge and bad conduct discharge are expressly punitive and can be awarded only upon conviction or a plea of guilty in a court-martial proceeding. The other three types of discharge can be awarded administratively. An undesirable discharge, such as that received by plaintiff, stigmatizes the recipient, usually resulting in loss of entitlement to federal and state veterans benefits and job opportunities. Lunding, *Judicial Review of Military Administrative Discharges,* 83 Yale L.J. 33, 35–6 (1973).

The regulations governing a good of the service ("GOS") discharge are set forth at 32 C.F.R. § 730.70. Section 730.72 specifies the advice to be given to one who requests a GOS discharge. The regulations require that an officer empowered to convene an administrative discharge board take "or cause to be taken" certain actions which include: notifying the member writing of the proposed discharge action and the general and specific bases for it and advising the member of certain rights.[10]

---

10. Section 730.73(a)(1)(iii) provides that the following action be taken:

Advise the member that he has the following rights, which will, unless he waives such

rights in writing, be afforded him: To present and have his case considered by an administrative discharge board of not less than three officers, at least one of whom will be a field

Pursuant to 32 C.F.R. § 730.73(a)(3) (1969), the permanent record is to contain the following documentation, or in lieu thereof, a certification by the officer taking the action that such action has been accomplished:

(i) A copy of the written notification to the member of the general and specific bases for the proposed discharge action.

(ii) The member's written acknowledgement of the advise given him of the purpose and scope of the Navy Discharge Review Board and the Board for Correction of Naval Records.

(iii) The member's written acknowledgement that he was given and understands the advise prescribed in paragraph (a)(iii) and/or (iv) of this section [waiver of rights and consequences of a GOS discharge].

(iv) The member's written waiver of any or all of the rights prescribed in paragraph (a)(1)(iii) of this section, and/or the member's written request for discharge for the good of the service, together with the member's written acknowledgement that he was afforded the opportunity to consult with counsel prior to effecting such waivers and/or request for discharge. The member's written acknowledgement will include the fact that he either chose not to consult with counsel prior to effecting such waivers and/or request for discharge, or, if he did so consult with counsel, the specific identity of the counsel and his legal qualifications.

The Uniform Code of Military Justice, 10 U.S.C. § 801 *et seq.*, and the Manual for Courts–Martial, United States, 1969 ("MCM"), set forth certain requirements before one can be subject to any court-martial proceeding. The formal written accusation in court-martial practice consists of two parts, the technical charge and the specification. The charge indicates the article the accused is alleged to have violated, while the specification sets forth the specific facts and circumstances relied upon as constituting the violation. Chapter VI, para. 24 MCM. Charges against the individual are to be preferred promptly. Article 10, UCMJ, 10 U.S.C. § 810; Chapter VI, para. 25 MCM. The trial counsel to whom court-martial charges are referred for trial shall have a copy of the charges upon which trial is to be had served upon the accused. A person cannot be brought to trial in a special court-martial case before the expiration of three days after the service of charges upon him. Article 35, UCMJ, 10 U.S.C. § 835.

Among the most basic rights to which an individual is entitled before being subjected to punishment is the requirement that the person accused be informed of the charges against him as soon as practicable. Article 30, UCMJ, 10 U.S.C. § 830. *See also* Article 10, UCMJ, 10 U.S.C. § 810: "When any person ... is placed in arrest or confinement prior to trial, immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or to dismiss the charges and release him."

Charges are ordinarily referred to a court-martial for trial by means of the indorsement on a charge sheet. The indorsement may include any proper instructions, such as in the case of a special court-martial, that the authorized maximum punishment does not include a bad-conduct discharge. Chapter VII, para. 33(j).

A review of plaintiff's case reveals a failure of the military to afford him his basic procedural rights as set forth under

grade officer, and composed in accordance with § 730.72(b); to appear in person before such board, subject to his availability; and to be represented by military counsel, who will be a lawyer within the meaning of article 27(b)(1) of the Uniform Code of Military Justice unless appropriate authority certifies in the permanent record the nonavailability of a lawyer so qualified and sets forth the qualifications of the substitute non-lawyer counsel. Advise the member that if he does not waive a hearing before an administrative discharge board, and upon the hearing of his case before such board, he will be entitled to those rights set forth in § 730.63(c)(2) through (5), (12), (14), (15), (18); (f), and (g). The advise as to the respondent's rights contained in the cited paragraphs of § 730.73 may be given in a summarized form. Further advise the member that before waiving any of these rights, in writing, it would be to his advantage to consult with counsel and that he will be given the opportunity to do so.

# 1450

the Uniform Code of Military Justice. Nowhere is there any evidence that plaintiff received written notice of the charges after October 1, 1969, and what disposition would be made of them. Plaintiff assumed a special court-martial proceeding had been scheduled, although he never received notice of such a proceeding. Furthermore, there is no evidence that the assault offense and failure to obey an order offenses of October 1 and 2 were ever preferred.

The record is also void of any documentation, other than the waiver form, that plaintiff appropriately waived his rights pursuant to 32 C.F.R. § 730.73(a)(1)(iii).[11] Even the waiver form is ambiguous. It merely informs plaintiff that he may be subject to court-martial; no differentiation is made between a general court-martial and a special court-martial.

Plaintiff signed the waiver on the obvious assumption that he would not have a trial. His appointed counsel did not appear to disabuse him of this notion. Captain Iorio could not state whether a date had been set for a court-martial proceeding. *See Lewis v. Marsh*, 672 F.Supp. 14 (D.C. 1987) (plaintiff's waiver of right to court martial in exchange for non-judicial punishment was not knowing or voluntary, where plaintiff was wrongly induced into believing that he would receive only limited punishment). *See also White v. Secretary of Army*, 878 F.2d 501 (D.C.Cir.1989) (discharge invalid where plaintiff's request for UD/GOS based on erroneous advise by appointed military counsel that court-martial plaintiff was facing at time could impose an undesireable discharge).

■ It is clear that plaintiff has established that his waiver was not knowing, intelligent, and voluntary. *See Fairchild v. Lehman*, 814 F.2d 1555, 1559 (Fed.Cir.

1987) (waiver of statutory right to trial by court-martial must comply with standards set forth in *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)). Plaintiff was "actively misinformed" as to the possibility of a court-martial, while it was unclear that such a proceeding would have been instituted. Plaintiff's agreement to accept the GOS discharge was obtained by improper means and in disregard of his rights. *See Middleton v. United States*, 170 Ct.Cl. 36 (1965). "Discharges have been held to be void where a serviceman has accepted a less than honorable discharge in lieu of a court martial ... in those situations where the choice with which he is told he is faced does not exist." *Haines v. United States*, 453 F.2d 233, 237 (3rd Cir.1971). As such, the BCNR had a clear duty to change it, and its failure to do so was arbitrary and capricious. *Id.* Furthermore, the BCNR's finding that plaintiff was afforded administrative due process is not supported by substantial evidence.[12]

■ The Court, therefore, finds that the decision of the BCNR cannot be sustained and plaintiff is entitled to relief. Defendant argues that the only remedy available is to remand the matter to the Secretary for further consideration. The Court disagrees. Recently, the Court of Appeals for the District of Columbia Circuit addressed the appropriate remedy in a situation similar to the one at bar where the plaintiff's undesirable discharge was found to be based on erroneous advise he received from counsel. The court stated: "Since appellant's undesirable discharge is fatally flawed and cannot be sustained, the only remedy available now that is also practical and appropriate is to treat him as if he had completed his full term, and to require that the Army give him either an honorable or a

---

11. Plaintiff introduced Exhibit 11 which was an example of an "Acknowledgement of Rights to be Exercised or Waived" form which is not present in plaintiff's file. The absence of the form further lends credence to plaintiff's contention that he was not fully advised of all his rights.

12. The Court also finds that the BCNR's decision not to alter the discharge was arbitrary and capricious because the BCNR failed to adequately consider and properly weigh the factors

which "obviously affected the soundness of [plaintiff's] decision." *See Robinson v. Resor*, 469 F.2d 944, 950 (D.C.Cir.1972). In addition to the procedural confusion surrounding the alleged court-martial proceeding, the Court notes that plaintiff had a history of emotional problems, the latest manifesting itself on the day he was accused of assaulting the corporal. He was in a stressful combat situation. He had complained of the racial hostility in his unit, and was apprehensive about possible racial strife.

general discharge." *White v. Secretary of the Army*, 878 F.2d 501, 506 (D.C.Cir.1989).

The Court agrees with the reasoning in *White*. More than twenty years have passed since plaintiff's discharge. The BCNR, after several requests from plaintiff, has refused to upgrade his discharge, in light of clear evidence that he was denied due process. Plaintiff has endured over twenty years of the stigma of a wrongly imposed UD, and therefore, the Court will not further stigmatize plaintiff with a general discharge.[13]

Furthermore, there must be a limit to the prejudice and inconvenience that plaintiff has suffered based on the agency's erroneous actions. It would be inequitable to require plaintiff to once again seek further review from the agency which has so blindly ignored his credible arguments over the years. Further delay is not warranted in this situation. *See Board of Education, City of Cincinnati v. Department of H.E.W.*, 655 F.Supp. 1504, 1547 (S.D.Ohio 1986).

The Court, therefore, remands the case to the Secretary of the Navy with instructions to recharacterize plaintiff's discharge as honorable. *See Justice v. Lyng*, 716 F.Supp. 1570, 1579 (D.Ariz.1989) (Court may remand with explicit instructions).

Judgment will be entered accordingly.[14]

IT IS SO ORDERED.

### JUDGMENT

Pursuant to the Memorandum Opinion and Order entered this date, the decision of the BCNR is vacated, and the case is remanded to the Secretary of the Navy with instructions to recharacterize plaintiff's discharge as honorable.

IT IS SO ORDERED.

---

**13.** "According to the Air Force the General Discharge creates a 'definite disadvantage to [a veteran] seeking civilian employment.' Courts have found the General Discharge to constitute a 'stigma of tremendous impact which [has] a lifelong effect, and a recent statistical study sup- ports these findings.'" Lunding, *Judicial Review of Military Administrative Discharges*, 83 Yale L.J. 33, 34–35 (1973).

**14.** The Court thanks court-appointed counsel for his excellent representation of plaintiff.